1

2

3

4

5

6

7

8                           **UNITED STATES DISTRICT COURT**

9                    **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10                                  **FRESNO DIVISION**

11

12   **PHILLIP ANGEL SENTENO**,                    CASE NO. 08cv0694-JLS(JMA)

13

14                                Petitioner,       **ORDER GRANTING  28 U.S.C. §**
                                                    **2254 HABEAS PETITION**
15        vs.

16   **STATE OF CALIFORNIA; DERRAL**
     **ADAMS, Warden,**
17

18                               Respondents.

19

20         Petitioner Phillip Angel Senteno ("Senteno"), a state prisoner confined at the California

21   Substance Abuse Treatment Facility and State Prison ("SATF"), Corcoran, proceeding *pro se* and *in*

22   *forma pauperis*, seeks a 28 U.S.C. § 2254 writ of habeas corpus.  He is serving an indeterminate life

23   sentence for murder, robbery, and assault following his jury trial in January 1983.  He challenges the

24   Governor's reversal of the Board of Parole Hearing's 2006 decision to grant him parole.  He raises four

25   due process grounds for relief associated with evidentiary challenges and the review standard the

26   Governor applied.  Respondent filed an Answer.[1]  (Dkt No. 9.)  Senteno filed a Traverse.  (Dkt No.

27   _____

28        [1]  The Answer is filed on behalf of the SATF warden where Senteno is incarcerated, K. Clark, his
     custodian. Stanley v. Cal. Supreme Court, 21 F.3d 359, 360 (9th Cir. 1994); Rule 2(a) foll. 28 U.S.C. § 2254.

1  10.)  Both sides electronically filed documents constituting the record.  (Dkt Nos. 2, 9.)  By Order

2  entered November 25, 2008, this matter was reassigned from the bench of the United States District

3  Court for the Eastern District of California, Fresno Division, to visiting District Judge Janis L.

4  Sammartino, United States District Court for the Southern District of California.  (Dkt No. 34.)  After

5  careful consideration of the parties' arguments, pertinent portions of the record, and controlling legal

6  authority, for the reasons discussed below, the Petition is **<u>GRANTED</u>**.

7  **I.      BACKGROUND**

8        **A.      <u>Procedural Background</u>**

9       In 1981, Senteno was in custody for several armed robberies when he participated with other

10  prisoners in beating one of their number while inside a holding cell.  The inmate died of his injuries.

11  Senteno was convicted by a jury in 1983 of first-degree murder.  The judge reduced the conviction

12  to second-degree murder and sentenced Senteno to 15-years-to-life for that crime, to be served

13  consecutively to his robbery conviction sentences, for a total term of 27-years, 4 months to life.  In

14  May 2006, at his fifth suitability hearing, the Board of Parole Hearings ("BPH") granted Senteno

15  parole.  (Pet. Exh. B, Part 3.)  The Governor reversed the BPH in September 2006 and denied him

16  parole.  (Answer, Dkt No. 9-8, pp. 19-22.)[2]

17       Senteno filed a petition for a writ of habeas corpus in Orange County Superior Court

18  challenging the Governor's reversal on due process grounds.  In its September 27, 2007 reasoned

19  decision denying the petition, the Superior Court applied the standards from the August 28, 2007

20  California Court of Appeal decision of <u>In re Jacobson</u>, 65 Cal.Rptr.3d 222 (Aug. 28, 2007) (upholding

21  the Governor's reversal of a BPH panel's grant of parole), *review granted by* <u>In re Jacobson</u>, 69

22  Cal.Rptr.3d  95 (Dec. 12, 2007).[3]  On December 13, 2007, while the California Supreme Court was

---

[2]  The Answer (Dkt No. 9) provides the Governor's decision as a scanned exhibit.  (Dkt No. 9-8, pp. 19-22). The Petition recites a copy of that decision was provided as its Exhibit K (Dkt No. 2-2, p. 1), but the Petition exhibits scanned into the docket end with Exhibit G, excluding listed exhibits H through L.

[3]  Review of the <u>In re Jacobson</u> matter was granted in December 2007, and the original opinion was superseded after the California Supreme Court in an October 28, 2008 Order referred the case to the "originating Court of Appeal with directions to vacate its decision and reconsider in light of <u>In re Lawrence</u> (2008) 44 Cal.4th 1181, <u>In re Shaputis</u> (2008) 44 Cal.4th 1241. . . ." 85 Cal.Rptr.3d 691 (Oct. 28, 2008) (parallel citations omitted).  In its March 18, 2009 unpublished decision, the Court of Appeal reconsidered the matter as directed, vacated the Governor's decision, and reinstated the BPH's decision granting parole.

1    reviewing several cases, including <u>Jacobson</u>, to clarify the proper application of the parole statute

2    factors, the California Court of Appeal summarily denied the habeas corpus petition Senteno had filed

3    there. (Answer Exh. 4.) He filed a Petition For Review in the California Supreme Court, arguing the

4    Governor's decision was not supported by any relevant or reliable evidence he currently would pose

5    an unreasonable risk to public safety if released on parole.[4] (Answer Exh. 5.) On February 27, 2008,

6    the California Supreme Court summarily denied Senteno's Petition For Review. (Answer Exh. 6.)

7         On April 4, 2008, Senteno filed his federal habeas Petition in the Central District of California.

8    By Order entered May 8, 2008, the matter was transferred to the Eastern District of California, the

9    jurisdiction where the SATF is located, pursuant to 28 U.S.C. §§ 1404(a) and 2241(d). (Dkt No. 1.)

10   There is no dispute the Petition was timely filed within AEDPA's one-year statute of limitations, and

11   his claims are not subject to any other procedural bar. *See* 28 U.S.C. § 2244(d)(1). The Petition

12   presents four grounds for relief: (1) "The failure of the Governor to find clear error with the Parole

13   Board granting panel, and failure to find that the panel failed to adequately consider all the evidence

14   before it, constitutes a violation of due process;" (2) the "Governor exceeded his authority of 'review'

15   when he conducted an independent suitability hearing without any constitutional safeguards required

16   of such a proceeding, violating Senteno's due process rights;" (3) the "Governor violated due process

17   when he conducted an independent suitability hearing without the complete record that was before the

18   Board panel;" and (4) the "Governor reversed the Board's granting decision without any relevant or

19   reliable information that Senteno remained a current unreasonable risk to public safety, if granted

20   parole, thus violating Senteno's due process rights." (Pet. pp. 5-6.) Respondent argues Senteno has

21

22        [4] In particular, he presented four questions "[i]n light of the [then pending reviews] granted in <u>In re</u>
     <u>Lawrence</u>, <u>In re Jacobson</u>, <u>In re Cooper</u>, <u>In re Shaputis</u>, and other similar parole cases the [California Supreme]

23   Court has granted review on." (Answer Exh. 5, p. 2). "**1.** Has the Court enlarged California Constitution,
     Article V, section 8(b) when it decided <u>In re Rosenkrantz</u>, 29 Cal.4th 616, when it gave the Governor

24   independent authority to make a finding of parole suitability, where the provision's plain language ONLY
     provides for a <u>review</u> of a Board decision? **2.** Does the Governor exceed his constitutional authority when he

25   conducted [*sic*] an independent suitability determination, and, if he is so authorized, did he violate Senteno's
     **due process rights** by conducting this suitability determination without any constitutional due process

26   safeguards inherent in such proceedings, **safeguards as stated by the United States Supreme Court**? **3.** Does
     the Governor violate due process when he conducts his determination without the complete record that was

27   before the Board? **4.** Did the Governor violate due process when he relied on factors that were irrelevant or
     unreliable and did not support the conclusion that Senteno posed a current unreasonable risk of danger to public

28   safety if released to parole? (Answer Exh. 5, p. 2 (emphasis added).)

1  not shown the state court result upholding the Governor's parole reversal was contrary to or an

2  unreasonable application of federal law, precluding relief.  (Answer 6:1-2, 8:1-2.)

3  **B.   Factual Background And Evidentiary Record**

4  Federal habeas courts presume the correctness of a state court's determination of factual issues.

5  The petitioner has "the burden of rebutting the presumption of correctness by clear and convincing

6  evidence." 28 U.S.C. § 2254(e)(1).  The parties do not dispute the Superior Court's factual summaries

7  in its reasoned decision, provided as Petition Appendix 3 and as Answer Exhibit 2.

8      In 198[1[5]], Petitioner was in jail for several armed robberies.
He was placed in a holding cell with several other prisoners. Petitioner

9  and a second inmate confronted a third inmate (the murder victim);
both hit, kicked and stomped the victim.  **Petitioner was removed**

10  **from the cell.  The victim was attacked two more times by other
inmates**.  By the time all of the inmates were removed from the

11  holding cell, the victim was nonresponsive and comatose. He later died
of brain injuries. Petitioner was convicted of second degree murder in

12  connection with the death.  (Case No. C-48220.)  Petitioner was
sentenced to 15 years to life for the murder, consecutive to the sentence

13  imposed for the robberies which was 10 years and four months, plus 1
year for each [of] 2 prior convictions, for a total of 27 years, 4 months

14  to life.  After Petitioner was convicted in Case No. C-48220, he was
convicted in another assault case and sentenced to 4 more years in

15  prison.  That sentence was ordered to be served concurrent to the life
term.  The assault case was also based on an incident which occurred

16  while Petitioner was incarcerated.

17  (Answer Exh. 2, pp. 1-2 (emphasis added).)

18  The Superior Court also summarized Senteno's fifth parole suitability proceedings, conducted

19  during his twenty- third year of incarceration:

20      A subsequent parole hearing was held before the Board of
Parole Hearings (hereafter individually and collectively referred to as

21  "the BPH") in May 2006.  Parole was granted.  **The BPH stated
Petitioner had decided to turn his life around, had disassociated**

22  **himself from prison gangs, and had demonstrated that he had
incorporated the lessons of NA and AA into his life.  The BPH**

23  **found Petitioner had been "rehabilitated for quite a while," had
"maintained positive institutional behavior," and had participated**

24  **in educational, vocational and self-help programs.   Numerous
letters and "laudatory chronos" from the institutional staff as well**

25  **as Petitioner's volunteer work attested to his long-term
rehabilitation. The BPH found Petitioner would not pose a risk to**

26  **society or a threat to public safety at this time if he were released**.

27

28  [5] The decision erroneously states "1983." Senteno was convicted for the murder in January 1983. The crime was committed in April 1981.  (Pet. Exh. H, Prt 3, p. 45.)

1

2

3

4

5

6

7

8

9

        In September 2006, the Governor reversed the BPH decision to grant parole to Petitioner.  **The Governor described Petitioner's *criminal history* as "deplorable and violent" both "inside correctional institutions as well as in free society."  The Governor stated, "The *gravity of the second-degree murder* committed by [Petitioner 25-years earlier] is alone sufficient for me to conclude presently that his release from prison would pose an unreasonable public-safety risk."**  The Governor then added that Petitioner's "record of other violent and criminal acts also weighs against parole, and the additional fact that [Petitioner] committed the life offense while in jail for several armed robberies makes his actions even more reprehensible."  The Governor mentioned Petitioner had "made some creditable gains in prison."  Nevertheless, the Governor found the negative factors outweighed the positive factors.  He concluded, "**[B]ecause I believe his release would pose an unreasonable risk of danger to society at this time, I REVERSE the Board's 2006 decision to grant parole** to [Petitioner]."

10   (Answer Exh. 2, pp. 1-2 (emphasis added); *see* Answer 9-8, p. 22.)

11           Senteno spoke extensively and interactively on the record at the May 2006 BPH hearing,

12   memorialized in a 109-page transcript.  (Pet. Exh. H.)  The panel found him to be  "in full compliance

13   with the Board's [prior] recommendations."  (Pet. Dkt No. 2-3, 34:12-19.)  Senteno's "current true

14   classification score" was zero.  (Id. at 34:21-22.)  He had "the lowest custody rating you can have as

15   a life term prisoner without a parole date as well."  (Id. at 35:2-7.)  "You are a validated dropout

16   according to the paperwork of the Mexican Mafia, the Eme" and consequently had "enemies both

17   listed in the confidential section and the non-confidential section," and was "currently housed in the

18   sensitive needs yard . . . based on that."  (Id. at 35:10-16; *see* Id. at 36:8-10 ("When I made the

19   decision to walk away from that lifestyle I was placed in protective custody. . . .")  The commissioner

20   observed it looked like "the list of enemies has a lot to do with the information you provided to help

21   the Department of Corrections" staff, as well as having "helped out the [FBI] . . . with information."

22   (Id. at 39:3-9.)  Comments "in the psychological reports and other documents" substantiated he had

23   been "helpful to the Department."  (Id. at 39:18-22.)

24           The record also reveals Senteno was at the time of the 2006 suitability hearing "a teacher's aide

25   with an exceptional rating." (Pet. Dkt No. 2-3, 40:1-2.)  He performed "class presentation and helping

26   students develop life plans and obtain social services" and had "been working in that assignment for

27   quite some time."  (Id. at 40:10-14.)  He previously worked "as a clerk with above average ratings,"

28

1   "Arts in Corrections muralist with . . . above average ratings, " "[c]lothing room with above average

2   ratings," and "library" doing "paralegal work" in which he was certified, with "exceptional" ratings.

3   (Id. at 40:15-41:18.) He had successfully participated in and addressed "the entire education facility's

4   staff development training on training day" in May 2004, and had "successfully completed the

5   certification unit on tools and equipment in metal work," among other things.  (Id. at 42:6-43:19.)

6   Numerous other certificates read into the record documented his completion of a wide range of

7   personal development and vocational training programs while incarcerated.  (Id. at 44:10-45:9.)

8   During the period between his 2005 and 2006 suitability hearings, he had added a completion

9   certification for a seven-week alcohol relapse prevention program, and a "Creating New Choices"

10  academic program.  In all the time he had been in prison, he had "a total of two rule violations," the

11  most recent from May 1990 for "disrupting the normal operations of the unit," and the other for an

12  inmate made-weapon violation when he first came to prison. (Pet. Dkt No. 2-4, 13:21-14:7.) He also

13  had two minor counseling chronos, the most recent from 2003.  (Id. at 15:21-16:9.)

14      Numerous chronos and letters praised Senteno's commitment to peer mentoring.  They

15  recognized his contributions to the "betterment of [his] peers" in areas such as inmate ethics courses,

16  and his display of "leadership skills" used "to help influence others to take positive steps to rehabilitate

17  themselves."  (Pet. Dkt No. 2-3, 45:8- 49:27; Pet. Dkt No. 2-4 9:7-13:13.)  He presented letters

18  identifying multiple resources available to him on release and attesting to his commitment to his

19  rehabilitated lifestyle. (Pet. 2-4, pp. 1- 6.)  The panel reviewed the record of his vocational skills and

20  experience (plumbing, auto body, cement finisher, masonry, paralegal).  (Id. at 6:3-8:12.)  He

21  presented several viable parole plan options, including outside job offers. (Id. at 35:16-36:17, 38:1-

22  39:4.) A 2000 "counselor's report" substantiated his participation in numerous self-help programs, his

23  "skills such as art for which he has received numerous laudatory chronos," and his attendance at

24  Narcotics Anonymous and Alcoholics Anonymous, as well as others describing his positive attitude

25  . (Pet. Dkt No. 2-3, 16:14-17:5; Pet. Dkt No. 2-4, pp.10-13.)

26      Psychological assessments from 2000 and 2004 evaluated Senteno as presenting a low risk of

27  dangerousness.  The mental health evidence reviewed on the record substantiates "no indication of a

28

severe mental disorder," "no treatment," and "no psychotropic medication." (Pet. Dkt No. 2-4, at 8:13-22.) Senteno had a "high" Global Assessment of Functioning ("GAF") score of 90, meaning "you're functioning quite well within the population, with peers as well as with staff members, employees of the Department of Corrections." (Id. at 8:12-9:4.) The BPH commissioner quoted from the 2000 report by Dr. R. Roston, Ph.D.:

> Under the psychologist's report the assessment of dangerousness within the prison setting: "Mr. Senteno has not received a CDC 115 or other disciplinary action since 1990. **Within the prison environment he presents a low level of dangerousness compared to the average inmate. This is due to his consistent and continued efforts in rehabilitating himself and others. If released to the community he currently represents the same risk of dangerousness in the community when compared to the average citizen.**" Under the observations section: "**Mr. Senteno appears to have programmed and has been able to disconnect and change himself completely from being an addict to someone who is pro-community oriented.** Mr. Senteno **made many statements regarding his feelings of remorse for his crime and empathy towards the victim and his family**. I would recommend the continued efforts of attending Alcoholics Anonymous and Narcotics Anonymous and supporting a positive lifestyle. It is my opinion that the inmate currently represents and [*sic*] is **unlikely to resume** drug use or to reemerge in criminal activity while in the community."

(Pet. Dkt No. 2-4, 17:6-18:14 (emphasis added).)

Senteno presented the commissioners at the hearing with a 2006 supplemental evaluation strongly supportive of his release prepared by Dr. Robin Schaeffer, an evaluator who had previously assessed Senteno in 2002 and 2003.[6] The commissioners remarked the new report was consistent with the most recent psychological evaluation in the record, the Psychosocial Assessment dated September 1, 2004 by Dr. A.N. Petsa, Ph.D. (Pet. Dkt No. 2-3, p. 24.) They noted "the old report stands on its own." (Pet. Dkt No. 2-2, p. 47; Pet. Dkt No. 2-4, Exh. G, pp. 101-106.) The BPH nevertheless read portions of Dr. Schaeffer's 2006 evaluation into the record. Senteno also quotes from that report in his Ancillary Petition. (Ancillary Pet. Dkt No. 2, pp. 17-11.) Dr. Schaeffer's conclusions confirmed Dr. Petsa's 2004 assessment and Dr. Roston's 2000 assessment Senteno presented a low risk: "These interacting clinical dynamics all support the conclusion that dangerousness and risk of recidivism are negligible." (Id. pp. 17-19.)

---

[6] Dr. Schaffer's 2006 evaluation is listed as Petition Exhibit I, but apparently it was not scanned.

1    Dr. Petsa's 2004 evaluation had substantiated Senteno's many achievements while incarcerated

2    and his appreciation that his drug abuse was instrumental in the crimes he committed, noting he

3    "accepts all responsibility for all of his acts" and credits "the 12-Step Program [as having] made a big

4    difference in my life."   (Pet. Dkt No. 2-4, Exh. G, p. 103.)   Dr. Petsa traced Senteno's

5    psychiatric/medical history from 1976, referencing Dr. Roston's September 2000 evaluation, which

6    confirmed findings from 1997 Senteno already had a GAF score of 90 "which excludes psychiatric

7    symptoms and a good level of functioning." Dr. Roston's 2000 report had found "complete remission"

8    from adult antisocial behavior, progress from a previous assessment of "much improved." (Id.) Dr.

9    Petsa noted:  "It appears that [Senteno] has given a lot of thought and time in considering his potential

10   network of supportive services available to him."  (Id. p. 104.)  "As stated by Mr. Senteno, this

11   represents the way he wants to shape his life; he wants to avoid recidivism and is interested in

12   continuing his recovery, as well as helping others."  (Id.)

13    In the "Clinical Assessment" section of his 2004 report,  Dr. Petsa observed, among other

14   things: "Mr. Senteno expressed remorse and empathy regarding his crime.  He also discussed his drug

15   dependency in an insightful and knowledgeable manner." (Pet. Dkt No. 2-4, Exh. G, p. 104.) Senteno

16   had "no difficulty talking about his crime," acknowledging "he participated in the murder," admitting

17   he "feels responsible for his involvement, saying 'I should have helped in saving his life.' " (Id.) "He

18   feels remorse, guilt, and empathy not only for the victim, but his family as well," and he "recognizes

19   that his violence and assault on the victim contributed to his death."  (Id., pp. 104-105.)  In the

20   "Assessment of Dangerousness" section, Dr. Petsa stated:

21           **Within the prison setting**:  Mr. Senteno has not received a 115 or any
             other disciplinary action since 1990.  Within the prison environment he
22           presents a low [risk] of dangerousness compared to the average inmate.
             This is due to his consistent and continued efforts in rehabilitating
23           himself and others.

24           **If released to the community**:  He currently represents the same risk
             of dangerousness in the community when compared to the average
25           citizen.

26   (Pet. Dkt No. 2-4, Exh. G, p. 105.)

27    Dr. Petsa's "Clinical Observations/Comments/Recommendations" provide, in their entirety:

28

1
2
3
4
5
6

> **Mr. Senteno appears to have programmed and has been able to disconnect and change himself completely from being an addict to someone who is pro-community oriented**. Mr. Senteno made many statements regarding his feelings of remorse for his crime and empathy toward the victim and his family.   [¶]   I would recommend the continued efforts of attending AA and NA and supporting a positive lifestyle. It is my opinion that the inmate currently represents and [*sic*] is unlikely to resume drug use or to re-emerge in criminal activity while in the community.  [¶]  Decisions made on this inmate's release should be made on factors other than mental health. There is no mental health concerns that would require follow-up treatment.

7   (Pet. Dkt No. 2-4, Exh. G, pp. 105-106 (emphasis added).)

8        The District Attorney's representative argued against parole at the suitability hearing.  Based

9   on the life-crime, he offered the BPH panel a personal belief "the inmate still continues to pose an

10   unreasonable risk of danger to society and a threat to safety if released from prison."  (Pet. Dkt No.

11   2-4, 23:27-24:3.)  He acknowledged "the evidence overwhelmingly demonstrated there was a group

12   assault of Bottoms" (Id. at 26:3-5), but in his opinion Senteno accepted insufficient personal

13   responsibility, despite the psychological assessments and Senteno's testimony to the contrary.  The

14   BPH asked Senteno to reconcile his prior behavior ("walking crime spree") with his good behavior

15   for the "last many years" leading up to the 2006 suitability hearing.  Senteno explained he was now

16   "a different person," in large part because "a lot of the crimes were motivated" by his prior drug

17   addiction and his wanting to fit in, issues and insecurities he had now resolved.  (Pet. Dkt No. 2-4,

18   20:6-17.)

19        The BPH granted Senteno parole, finding "through your time in prison you have in some small

20   way been able to basically earn your way out" by "turning your life around," and "we do not feel that

21   you are a risk to society or a threat to public safety any longer."  (Pet. Dkt No. 2-4, 41:8-16.)

22
23
24
25
26
27
28

> [W]hile you have been in prison **you have enhanced your ability to function within the law upon release through participation in educational programs, vocational programs, self-help and institutional job assignments.** . . . You've been down 23 years. You've completed 24 units on college. . . . On the outside you were a mason and a plumber.  And while incarcerated you have worked as a tutor, law library clerk and library assistant. **You've also consistently participated in Alcoholics Anonymous and Narcotics Anonymous.** And you were able to demonstrate in your conversations today **not only that you learned the classroom lessons of AA but how you have incorporated those lessons into your own life.** And also because **you have a maturation growth rate and understanding and advanced**

**age, you have a reduced probability of recidivism**.  You have **realistic parole plans which include a job offer and family support**.  And you also have numerous letters or laudatory chronos from institution staff and others that have gotten to know you through their volunteer work that attest to your long term rehabilitation.  **And by that I mean you've been rehabilitated for quite a while now.** . . .

**And also Mr. Senteno has maintained positive institutional behavior which indicates significant improvement in self-control.**  And that is attested to by receiving only two CDC 115's in his entire incarceration.  And Mr. Senteno has also maintained close ties with various members of the community.  And he has letters and visits with these individuals.  **And he also shows signs of remorse. . . . And he understands the nature and magnitude of the crime.  And he does accept responsibility for his criminal behavior and has a desire to change towards good citizenship**. . . . And the previous psychological evaluation, the last one was done September 1, 2004 by Dr. Petsa. . . . Says that you are **unlikely to resume drug use and to re-emerge in criminal activity while in the community**.  And the evaluation prior to that September 18, 2000 by Dr. Roston. . . .  Says, paroled persons like Mr. Senteno makes him . . . a salient model for other inmates in the inmate population, understands that good behavior, constructive change leads to possible parole release. . . . [T]he last section of **Dr. Roston's report really all deals with how he feels that you would not be a risk**. . . .

. . . Your criminal record, the commitment offense is horrific. . . .  That concerned us a great deal as well.  The problem is that you've done well not only in prison on two prior terms and then do lousy when you get on the streets.  Which certainly is our concern. . . .[¶]  As far as your institutional programming, that's the other side of the coin, totally a dramatic change.  **I've been in this business for about 37 years and you see few people that have your background change that significantly** unless you're just really good about talking**.  You've persuaded a lot of people to consider you as a model inmate, a person that has sincerely changed**. . . . They know your lifestyle and how you've behaved. . . . Positive remarks from psychologists, remarks from correctional officers, staff as well as instructors, persons of different faiths and religions from programs you'd set up, **so I'm convinced that you are a safe, good risk at this point in your life to be released**. . . .

(Pet. Dkt No. 2-4, 41:26-49:6 (emphasis added); *see also* Pet. Dkt No. 2-3, 40:24-41:6: "Through the years the panel finds that you have indeed been remorseful" and "you have expressed your remorse not only through your words but by actions;" you "disassociated from the prison gang you were a member of and also the rehabilitation efforts that you have initiated and established in the prison system" once he "decided to turn your life around." ).

1   The Governor disagreed and reversed the BPH.  (Dkt No. 9-8, pp. 19-22).  In its reasoned

2   decision, the Superior Court selected and applied to the Governor's decision the narrowest construction

3   and most highly deferential standard of review from among the various California case articulations

4   then available, to conclude the record supported the Governor's findings the crime was heinous and

5   Senteno's criminal history deplorable:   "Thus, notwithstanding Petitioner's 'creditable gains,' a

6   modicum of evidence supports the reversal decision. . . [and] [t]his court is therefore estopped from

7   setting the decision aside."  (Answer Exh. 2, p. 4.)

8   **II.     DISCUSSION**

9           **A.     Legal Standards**

10                  **1.     Federal Habeas Review**

11   A federal court "shall entertain an application for a writ of habeas corpus in behalf of a person

12   in custody pursuant to the judgment of a State court only on the ground he is in custody in violation

13   of the Constitution or laws or treaties of the United States."  28 U.S.C.A. § 2254(a).  Only errors of

14   federal law can support federal intervention in state court proceedings.  Oxborrow v. Eikenberry, 877

15   F.2d 1395, 1400 (9th Cir. 1989).  Federal habeas courts are bound by a state's interpretations of its

16   own laws.  Himes v. Thompson, 336 F.3d 848, 852 (9th Cir. 2003); Estelle v. McGuire, 502 U.S. 62,

17   68 (1991) (federal courts may not reexamine state court determinations on state law questions).

18   Federal habeas petitions filed after April 24, 1996 are governed by the Antiterrorism and

19   Effective Death Penalty Act of 1996 ("AEDPA").  AEDPA establishes a "highly deferential standard

20   for evaluating state-court rulings," requiring "that state-court decisions be given the benefit of the

21   doubt."  Woodford v. Visciotti, 537 U.S. 19, 24 (2002).  A federal court can grant a prisoner habeas

22   relief only if it determines the result of a claim adjudicated on the merits by a state court "was contrary

23   to, or involved an unreasonable application of clearly established Federal law, as determined by the

24   Supreme Court of the United States," or "was based on an unreasonable determination of the facts in

25   light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *see* Bell v. Cone,

26   535 U.S. 685, 694 (2002); Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).  A state court's decision

27   is "contrary to" clearly established federal law if it (1) applies a rule that contradicts governing

28

1    Supreme Court authority, or (2) it "confronts a set of facts that are materially indistinguishable from"

2    a Supreme Court decision but reaches a different result. Early v. Packer, 537 U.S. 3, 8 (2002). To be

3    found "unreasonable," the application of the precedent "must have been more than incorrect or

4    erroneous;" it "must have been 'objectively unreasonable.'" Wiggins v. Smith, 539 U.S. 510, 520-21

5    (2003) (citation omitted); see also Middleton v. McNeil, 541 U.S. 433, 436 (2004) (per curiam).

6        A legal principle can provide the law against which to measure a state court decision for

7    28 U.S.C. § 2254(d)(1) "contrary to" or "unreasonable application" analysis. See Lockyer v. Andrade,

8    538 U.S. 63, 71-72, 76 (2003) ("clearly established federal law" refers to the governing legal principle

9    or principles set forth by the Supreme Court at the time the state court renders its decision"); see also

10   Bradley v. Duncan, 315 F.3d 1091, 1101 (9th Cir. 2002) (Supreme Court precedent includes not only

11   bright-line rules but also the legal principles and standards flowing from such precedent), citing

12   Williams v. Taylor, 529 U.S. 362, 407 (2000). A petitioner may also obtain habeas relief if the state

13   court's factual determinations lack a reasonable evidentiary foundation. 28 U.S.C. § 2254(d)(2). A

14   reviewing federal court may find an unreasonable determination of the facts when the state court failed

15   to assess highly probative evidence central to the petitioner's claim. Taylor v. Maddox, 366 F.3d 992,

16   1005, 1008 (9th Cir. 2004) ("In passing section 2254(d)(2), Congress has reminded us that we may

17   no more uphold such a factual determination [that failed to consider key aspects of the record] than

18   we may set aside reasonable state-court fact-finding");[7] see Miller-El. 537 U.S. at 346, 340. "When

19   we determine the state court fact-finding is unreasonable, therefore, we have an obligation to set those

20   findings aside and, if necessary, make new findings." Taylor, 366 F.3d at 1008.

21       A federal habeas court applying those standards looks to the last reasoned state court decision.

22

23       [7] "In making findings, **a judge must acknowledge significant portions of the record, particularly
     where they are inconsistent with the judge's findings.** The process of explaining and reconciling seemingly
24   inconsistent parts of the record lays bare the judicial thinking process, enabling a reviewing court to judge the
     rationality of the fact-finder's reasoning. . . . **[F]ailure to take into account and reconcile key parts of the
25   record casts doubt on the process by which the finding was reached, and hence on the correctness of the
     finding**. See, e.g., Gui v. INS, 280 F.3d 1217, 1228 (9th Cir.2002) (failure of immigration judge to support
26   adverse credibility finding with specific, cogent reasons constitutes grounds for reversal); Winans v. Bowen,
     853 F.2d 643, 647 (9th Cir.1988) (failure of ALJ to give specific reasons for ignoring treating physician's
27   opinion constitutes grounds for reversal) . . . [¶] Failure to consider key aspects of the record is a defect in the
     fact-finding process. Miller-El. 537 U.S. at 346. How serious the defect, of course, depends on what bearing
28   the omitted evidence has on the record as a whole." Taylor, 366 F.3d at 1007-08 (emphasis added).

1   Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); *see* Ylst v. Nunnemaker, 501 U.S. 797,

2   803 (1991) (when there is no reasoned decision from the state's highest court, the federal court "looks

3   through" to the rationale of the underlying decision).  The denial of a petition by the state's highest

4   court "without comment or citation constitute[s] a decision on the merits of the federal claims," and

5   "such claims [are] subject to review in federal habeas proceedings."  Hunter v. Aispuro, 982 F.2d 344,

6   347-48 (9th Cir. 1992).  When no reasoned state court decision addresses the federal component of

7   a claim, the federal court "must conduct 'an independent review of the record . . . to determine whether

8   the state court clearly erred in its application of controlling federal law' " or reached a result contrary

9   to that authority.  McCarns v. Dexter, 534 F.Supp.2d 1138, 1148 (C.D.Cal. 2008), *quoting* Delgado

10  v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

11            **2.       Due Process In Parole Context**

12            **a.       California Prisoners Have A Liberty Interest In Parole**

13        The Fifth and Fourteenth Amendments prohibit the government from depriving an inmate of

14  life, liberty, or property without due process of law.  The due process analysis proceeds in two steps.

15  First, the court determines whether the state has interfered with a constitutionally-protected interest.

16  If so, the court then determines whether the procedures accompanying the interference were

17  constitutionally sufficient.  *See* Biggs v. Terhune, 334 F.3d 910, 913 (9th Cir. 2003) ("In analyzing

18  the procedural safeguards owed to an inmate under the Due Process Clause, we must look at two

19  distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2)

20  a denial of adequate procedural protections").

21        It is well established there is "no constitutional or inherent right of a convicted person to be

22  conditionally released before the expiration of a valid sentence," but a state can create a liberty interest

23  protected by due process guarantees when its statutory parole scheme creates "an expectation of

24  parole."  Greenholtz v. Inmates of Nebraska. Penal & Corr. Complex, 442 U.S. 1, 7, 11-14 (1979)

25  (holding the Nebraska parole statute providing the Board "shall" release prisoners, subject to certain

26  restrictions, created a due process liberty interest in release on parole); *see also* Board of Pardons v.

27  Allen, 482 U.S. 369, 377-78, 381 (1987) (finding the same with respect to the Montana parole statute);

28

1    *see* Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 460, 463 (1989) ("the use of

2    'explicitly mandatory language,' in connection with the establishment of  'specified substantive

3    predicates' to limit discretion, forces a conclusion that the State has created a liberty interest," but

4    finding no liberty interest entitled to the protections of the Due Process Clause was created by prison

5    visitation regulations), *quoting* Hewitt v. Helms, 459 U.S. 460, 472, 466 (1983) (protected liberty

6    interests "may arise from two sources – the Due Process Clause itself and the laws of the States");[8]

7    *see also* Sass v. California Board of Prison Terms, 461 F.3d 1123, 1127 (9th Cir. 2006); Biggs, 334

8    F.3d at 913, *citing, inter alia,* McQuillion v. Duncan, 306 F.3d 895, 900, 903 (9th Cir. 2002) (a parole

9    rescission case recognizing a California state prisoner serving an indeterminate life sentence has a

10   cognizable liberty interest in release on parole, based on the close resemblance between California's

11   parole scheme and those construed in Allen, 482 U.S. 369 and Greenholtz, 442 U.S. 1).

12           California prisoners serving indeterminate sentences "may serve up to life in prison, but

13   become eligible for parole consideration after serving minimum terms of confinement."   In re

14   Dannenberg, 34 Cal.4th 1061, 1078 (2005). "[P]rior to [an] inmate's minimum eligible parole release

15   date a panel of two or more commissioners or deputy commissioners shall again meet with the inmate

16   **and shall normally set a parole release date.**"  CAL. PEN. CODE § 3041(a) (emphasis added). "The

17   panel or board . . .  **shall set a release date unless** it determines that the gravity of the current

18   convicted offense or offenses, or the timing and gravity of current or past convicted offense or

19   offenses, is such that **consideration of the public safety requires a more lengthy period of**

20   **incarceration for this individual**, and that a parole date, therefore, cannot be fixed at this meeting."

21   CAL. PEN CODE § 3041(b) (emphasis added).  That language creates a presumption that parole will

22   be granted unless reliable evidence of record raises public safety concerns, and the Ninth Circuit has

23   repeatedly held California's parole statute gives rise to a constitutionally protected liberty interest

24

---

25           [8]  Sandin v. Connor, 515 U.S. 472, 479-84 (1995) modified the Hewitt mandatory language
     methodology for finding a protected liberty interest in the regulation of conditions of confinement context.
26   Respondent observes Sandin "abrogated Greenholtz's methodology for establishing a liberty interest." (Answer
     3:13-14, citing Wilkinson v. Austin, 545 U.S. 209, 229 (2005), a prisoner civil rights class action challenging
27   assignments to Ohio's supermax prison.)   Respondent concedes Austin confirmed Greenholtz remains
     "instructive for [its] discussion of the appropriate level of procedural safeguards."  (Answer 6, n. 2, quoting
28   Austin, 545 U.S. at 229.)

08cv0694

requiring due process in the suitability determination process. <u>Irons v. Carey</u>, 505 F.3d 846, 850-51 (9th Cir.), *reh'g and reh'g en banc denied by* 506 F.3d 951 (9th Cir. 2007) ("California Penal Code section 3041 vests . . . all . . . California prisoners whose sentences provide for the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause"), *citing* <u>Sass</u>, 461 F.3d at 1128; <u>Biggs</u>, 334 F.3d at 914; <u>McQuillion</u>, 306 F.3d at 901-03.   A release date must be set unless "consideration of the public safety requires a more lengthy period of incarceration" before a date can be fixed.[9]   CAL. PENAL CODE § 3041(b).   Given the present state of the law, the Court rejects Respondent's argument Senteno has no liberty interest in parole.   (Answer 3:5-23.)

### b.   **Procedural Due Process Safeguards Include "Some Evidence"**

Respondent argues "[e]ven if Senteno has a federal liberty interest in parole, he received all due process to which he was entitled under clearly established federal law because he was provided with an opportunity to be heard and a statement of reasons for the Governor's decision."   (Answer 3:24-27, *citing* <u>Greenholtz</u>, 442 U.S. at 16; Answer 6:16-19.)   Respondent insists <u>Greenholtz</u> is the only United States Supreme Court authority articulating due process rights in the parole context, and additional procedural safeguards applicable in other contexts, such as prison disciplinary proceedings, are not transferrable for AEDPA purposes.   (Answer 6:21-22: A "test announced in one context is not clearly established federal law when applied to another context.")   Respondent argues the "some evidence" standard   invoked by Senteno, as enunciated in <u>Superintendent v. Hill</u>, 472 U.S. 445, 457 (1985) in the prison disciplinary hearing context, is inapplicable to parole proceedings.   *See* <u>Hill</u>, 472 U.S. at 454 (holding "revocation of good time does not comport with 'the minimum requirements of due process,' unless the findings of the prison disciplinary board are supported by some evidence in the record").

However, the Ninth Circuit and the California courts have adopted the <u>Hill</u> standard in the context of parole suitability determinations.   Respondent contends Senteno has no "federally-protected

---

[9]   The pertinent parole criteria and guidelines for life prisoners appear at CAL. CODE REGS, tit. 15, §§ 2280, *et seq.*   Parole criteria and guidelines for murders committed on or after November 8, 1978 appear at CAL. CODE REGS, tit. 15, §§ 2401, *et seq.*

1   liberty interest in parole and, therefore, . . . he has not stated a federal question invoking this Court's

2   jurisdiction" (Answer 3:5-6), but "acknowledges that in <u>Sass v. California Board of Prison Terms</u>, 461

3   F.3d 1123, 1128 (9th Cir. 2006) the Ninth Circuit held that California's parole statute creates a federal

4   liberty interest in parole under the mandatory-language of <u>Greenholtz</u>." (Answer 3:20-23.)

5   Respondent contends under AEDPA, "Circuit court precedent is relevant only to the extent it clarifies

6   what constitutes clearly established law," and is not itself controlling authority.  (Answer 7:13-14,

7   quoting <u>Earp v. Ornoski</u>, 431 F.3d 1158, 1182 (9th Cir. 2005).)  The question whether the "some

8   evidence" standard applies to parole decisions, among other issues, is presently before a Ninth Circuit

9   *en banc* panel in <u>Hayward v. Marshall</u>, 512 F.3d 536, *reh'g en banc granted*, 527 F.3d 797 (9th Cir.

10   2008), and Respondent contends therefore "the Ninth Circuit's use of the some-evidence standard is

11   not clearly established federal law and is not binding on this Court."  (Answer 7:8-17.)

12       Despite Respondent's argument, this Court is bound by Ninth Circuit authority applying the

13   "some evidence" standard from <u>Hill</u> as clearly established for purposes of federal habeas review in the

14   parole context.  *See* <u>Sass</u>. 461 F.3d at 1128-29 (a California prisoner serving a term of years to life

15   sentence with the possibility of parole has a protected liberty interest in release on parole and,

16   consequently, a right to due process in parole suitability proceedings; for purposes of AEDPA, the

17   "some evidence" standard from <u>Hill</u> is "clearly established" federal law).  Both the parole context and

18   the good-time credits context addressed in <u>Hill</u> "directly affect the duration of the prison term."

19   <u>Jancsek v. Oregon Board of Parole</u>, 833 F.2d 1389, 1390 (9th Cir. 1987); *see also* <u>Sims v. Roland</u>, 414

20   F.3d 1148, 1151 (9th Cir. 2005) ("Although the statutory formulation [of 28 U.S.C. § 2254(d)(1)'s

21   "clearly established" phrase] restricts federal law to Supreme Court precedent, . . . 'Ninth Circuit

22   precedent may be persuasive authority for purposes of determining whether a particular state court

23   decision is an unreasonable application of Supreme Court law, and may also help . . . determine what

24   law is clearly established' ") (citation omitted).  Unless and until the pertinent principles in <u>Sass</u>, 461

25   F.3d 1123, <u>Irons</u> 505 F.3d 846, and <u>Biggs</u>, 334 F.3d 910 are overruled, the law in this Circuit remains

26   that California's parole scheme creates a federally protected liberty interest in parole that requires

27   "some evidence" to support a determination the inmate currently poses a public safety risk. *See* <u>Irons</u>,

28

505 F.3d at 851 ("[T]he Supreme Court [has] clearly established that a parole board's decision deprives

a prisoner of due process with respect to this interest if the board's decision is not supported by 'some

evidence in the record' . . . or is 'otherwise arbitrary' "), *quoting* Sass, 461 F.3d at 1128-29, *citing* Hill,

472 U.S. at 457, 455-56; *see also* Jancsek, 833 F.2d at 1390-91 (applying Hill as well as the

requirement "the evidence underlying the [denial] decision must have some indicia of reliability" to

uphold denial of parole); Biggs, 334 F.3d at 915; McQuillion, 306 F.3d at 904; Caswell v. Calderon,

363 F.3d 832, 838-39 (9th Cir. 2004) (a parole denial is arbitrary and capricious if not supported by

evidence).  The California Supreme Court has also adopted the Hill "some evidence" standard for

review of parole decisions.[10]  Rosenkrantz, 29 Cal.4th 616.

### c.     The Evidence Of Dangerousness Requirement

The evidentiary analysis is "framed by the statutes and regulations governing parole suitability

determinations in the relevant state."  Irons, 505 F.3d at 851 ("[W]e must look to California law to

determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must

review the record in order to determine whether the state court decision holding that these findings

were supported by 'some evidence' in [the petitioner's] case constituted an unreasonable application

of the 'some evidence' principle articulated in Hill, 472 U.S. at 454").  The dispositive issue is

"whether the inmate poses 'an unreasonable risk of danger to society if released from prison,' and thus

whether he or she is suitable for parole").  In re Lawrence, 44 Cal.4th 1181, 1202 (2008) (citation

omitted).

The BPH "must apply detailed standards when evaluating whether an individual is unsuitable

for parole on public safety grounds," but has broad discretion in deciding what weight to give the

codified factors bearing on the suitability decision.  Dannenberg, 34 Cal.4th at 1071,1080, 1096 n.16;

---

[10]  "In Rosenkrantz, our Supreme Court set forth the appropriate standard of review. '[T]he judicial branch is authorized to review the factual basis of a decision of the Board denying parole in order to ensure that the decision comports with the requirements of due process of law, but in conducting such a review, the court may inquire only **whether some evidence in the record before the Board *supports the decision* to deny parole, *based upon the factors* specified by statute and regulation**. If the decision's consideration of the specified factors is not supported by some evidence in the record and thus is devoid of a factual basis, the court should grant the prisoner's petition for writ of habeas corpus and should order the Board to vacate its decision denying parole and thereafter to proceed in accordance with due process of law.' "  In re Roderick, 154 Cal.App.4th 242, 263 (2007) (emphasis added), *quoting* Rosenkrantz, 29 Cal.4th at 658.

*see* <u>Rosenkrantz</u>, 29 Cal.4th at 677.  To avoid an arbitrary and capricious result, the panel must consider both circumstances tending to show unsuitability[11] and circumstances tending to show suitability.[12]  The regulations direct both the Board and the Governor to consider "**all relevant, reliable information available**" in determining parole suitability.  CAL. CODE REGS., tit. 15, § 2402(b) (emphasis added); <u>Rosenkrantz</u>, 29 Cal.4th 616.  In reviewing a BPH result, "[t]he Governor may only affirm, modify, or reverse the decision of the parole authority **on the basis of the same factors which the parole authority is required to consider**. . . ."  Cal. Const. Art. 5, § 8 (emphasis added).

The regulations permit the BPH or the Governor to rely on immutable facts, such as those associated with the unsuitability factors of the circumstances of the life commitment offense and the prisoner's history of criminality, as evidence the prisoner is not suitable for parole, as long as those factors remain predictive of a current public safety risk.  However, as observed by the <u>Biggs</u> and <u>Irons</u> courts, over time, those remote factors become less reliable predictors of present dangerousness.  Repeated denials of parole based solely on unchangeable circumstances could violate due process when there is evidence of the inmate's intervening rehabilitation.  *See* <u>Irons</u>, 505 F.3d at 853-54.

Moreover, **"it is not enough that there is some evidence to support *the factors* cited for the denial; that evidence must also rationally support *the core determination* required by the**

---

[11]  Factors tending to show **unsuitability** include:  (1) the "especially heinous, atrocious, or cruel manner" of **the commitment offense**, considering such factors as multiple victims "attacked, injured or killed in the same or separate incidents," the offense "was carried out in a dispassionate and calculated manner, such as an execution-style murder," "the victim was abused, defiled or mutilated during or after the offense;" the manner of the offense "demonstrates an exceptionally callous disregard for human suffering," and "the motive for the crime is inexplicable or very trivial in relation to the offense;" (2) the prisoner's **previous record of violence**, meaning he "on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age;" (3) "unstable or tumultuous" **social history** in relationships with others; (4) **psychological factors**, meaning "a lengthy history of severe mental problems related to the offense;" and (5) **institutional behavior** by engaging in serious misconduct while incarcerated.  CAL. CODE REGS., tit. 15, § 2402(c) (emphasis added).

[12]  Factors tending to show **suitability** include:  (1) no juvenile record; (2) **stable social history**, meaning the "prisoner has experienced reasonably stable relationships with others;" (3) **signs of remorse**, including such indices as giving "indications that he understands the nature and magnitude of the offense;" (4) **motivation for the crime** resulted from "significant stress in his life, especially if the stress had built up over a long period of time;" (5) lack of any "significant history of violent crime;" (6) the **prisoner's age** reduces the probability of recidivism; (7) the "prisoner has made **realistic plans for release** or has developed **marketable skills** that can be put to use upon release;" and (8) **institutional behavior and activities** "indicate an enhanced ability to function within the law upon release."  CAL. CODE REGS., tit. 15, § 2402(d) (emphasis added).

08cv0694

1    **statute before parole can be denied,** *i.e.*, **that a prisoner's release will unreasonably endanger**

2    **public safety**." In re Roderick, 154 Cal.App.4th 242, 263, 264 (2007) (emphasis added), *citing* In re

3    Lee, 143 Cal.App.4th 1400, 1409 (2006) ("The test is not whether some evidence supports the reasons

4    the Governor cites for denying parole, but whether some evidence indicates a parolee's *release*

5    *unreasonably endangers public safety*," vacating the Governor's decision to reverse the BPH's grant

6    of parole on grounds the prisoner's offenses were "atrocious" and the prisoner only belatedly accepted

7    responsibility for the crimes).   "Some evidence of the existence of a particular factor does not

8    necessarily equate to some evidence the parolee's release unreasonably endangers public safety." Lee,

9    143 Cal.App.4th at 1408; *see* McCarns, 534 F.Supp.2d at 1150, 1153 (vacating the Governor's reversal

10   of the BPH's parole grant because of undisputed evidence of rehabilitation).   "[T]he relevant question

11   is whether there is any evidence in the record that could support **the conclusion** reached [by the state

12   agency]." Sass, 461 F.3d at 1128, *quoting* Hill, 472 U.S. at 455-56 (emphasis added).

> The Penal Code and corresponding regulations establish that the fundamental consideration in parole decisions is public safety [and] the core determination of "public safety" . . . involves an assessment of an inmate's *current* dangerousness. . . . [A] parole release decision authorizes the Board (and the Governor) to identify and weigh **only the factors relevant to predicting "whether the inmate will be able to live in society without committing additional antisocial acts."** These factors are designed to guide an assessment of the inmate's threat to society, *if released*, and hence could not logically relate to anything but the threat *currently* posed by the inmate.

Lawrence, 44 Cal.4th at 1205-06 (citation omitted) (bolded emphasis added).

        The Governor's independent review of a prisoner's suitability for parole includes the discretion

to be more stringent or cautious in determining whether the inmate would pose an unreasonable risk

to public safety if released than was the BPH panel.  In re Shaputis, 44 Cal.4th 1241 (2008) (*reh'ing*

*den.* Oct. 22, 2008); Lawrence, 44 Cal.4th 1181 (same).  Nevertheless, those opinions reinforce the

line of cases the Jacobson appellate court in its initial opinion rejected as purportedly extending

Rosenkrantz too far, the only authority the Superior Court cited to deny Senteno's petition for a writ

of habeas corpus.  The subsequent history of the Jacobson case reflects a settling of the inconsistency

in the California courts' construction of the standard and a reversal of the initial Jacobson result.

        The August 2007 Jacobson opinion relied only on California case law, the California

1  Constitution, and California statutes and regulations and applied "the 'extremely deferential' standard

2  of review of the Governor's decision compelled by <u>In re Rosenkrantz</u> (2002) 29 Cal.4th 616 -- a

3  standard that examines only whether the factual basis on which the Governor relies to deny parole

4  gives due consideration to the factors he is required by law to consider as applicable to the particular

5  inmate, is drawn from the record before the Board, and is supported by 'some evidence' in that

6  record."[13]  <u>Jacobson</u>, 65 Cal.Rptr.3d at 224.  The <u>Jacobson</u> court expressly broke from other California

7  appellate courts construing <u>Rosenkrantz</u> more broadly at the time,[14] including some of the same

8  California authority as informs this case (but as subsequently clarified by the California Supreme

9  Court), <i>i.e.</i>, <i>inter alia</i>, <u>Lee</u>, 143 Cal.App.4th 1400, <u>In re Scott</u>, 133 Cal.App.4th 573 (2005), <u>In re</u>

10  <u>Lawrence</u>, 150 Cal.App.4th 1511 (2007), and <u>In re Roderick</u>, 154 Cal.App.4th 242 (2007).

11      In December 2007, the California Supreme Court accepted a Petition For Review in <u>Jacobson</u>

12  to decide the question:  "In making parole suitability determinations for life prisoners, to what extent

13  should the Board of Parole Hearings, under Penal Code section 3041, and the Governor, under Article

14  V, section 8(b) of the California Constitution and Penal Code section 3041.2, consider the prisoner's

15  current dangerousness, and at what point, if ever, is the gravity of the commitment offense and prior

16  criminality insufficient to deny parole when the prisoner otherwise appears rehabilitated?"  <u>In re</u>

17  <u>Jacobson</u>, 69 Cal.Rptr.3d 95 (2007).   Before deciding the matter, in an Order entered

18  October 28, 2008, the California Supreme Court transferred the <u>Jacobson</u> case and others back "to the

19  originating Court of Appeal with directions to vacate its decision and reconsider the cause in light of

20

21

22

_____

23      [13] "On appeal, [the <u>Jacobson</u>] petitioner does not challenge the <u>Rosenkrantz</u> 'some evidence' standard
      on the ground that federal due process requires a broader standard of review.  <u>Rosenkrantz</u> itself had 'no
24    occasion to determine whether the <i>same</i> standard [of review] is also mandated under federal constitutional
      principles,' and noted that 'petitioner does not contend that the federal Constitution imposes a more stringent
25    standard.' "  <u>Jacobson</u>, 65 Cal.Rptr.3d at 230, n. 5, <i>quoting</i> <u>Rosenkrantz</u>, 29 Cal.4th at 658, n. 12.

26      [14] "We disagree with the recent decisions of some courts of appeal . . . which have transmuted the
      <u>Rosenkrantz</u> standard into one that permits the court to reweigh evidence, recalibrate relevant factors, and reach
27    an independent determination whether the inmate continues to pose a risk to public safety."  <u>Jacobson</u>, 65
      Cal.Rptr.3d at 224, 234 (finding "some evidence in the record" to support the Governor's reliance "primarily
28    on his view of the circumstances of the crime" factor).

1  In re Lawrence (2008) 44 Cal.4th 1181 and In re Shaputis (2008) 44 Cal.4th 1241."[15]  In re Jacobson,

2  85 Cal.Rptr.3d 691 (2008) (parallel citations omitted).  In an unpublished opinion, the California Court

3  of Appeal reconsidered its initial Jacobson decision as directed, and reached  the opposite conclusion.

4  It applied the Lawrence and Shaputis clarifications to find the Governor's decision reversing the parole

5  grant was not supported by "some evidence," granted the habeas corpus petition, and reinstated the

6  Board's decision.  In re Jacobson, 2009 WL 692425 ** 3-5 (Mar. 18, 2009).

7       The Lawrence and Shaputis courts reaffirmed the relevant inquiry is and was "whether some

8  evidence supports the decision of the Board or the Governor that the inmate constitutes a current threat

9  to public safety, and not merely whether some evidence confirms the existence of certain factual

10  findings." Lawrence, 44 Cal. 4th at 1212 (vacating the Governor's decision to reverse the BPH's grant

11  of parole and reinstating the Board's order on that basis), *citing* Rosenkrantz, 29 Cal.4th at 658; *see*

12  Dannenberg, 34 Cal.4th at 1071; Lee, 143 Cal.App.4th at 1408.  Like the Ninth Circuit's concern

13  continued reliance over time on immutable factors alone to support denial of parole could eventually

14  violate due process (*see* Biggs, 334 F.3d at 917; Sass, 461 F.3d at 1126; Irons, 505 F.3d at 853-54),

15  the California Supreme Court has also acknowledged the aggravated nature of a commitment offense

16  may fail over time to provide "some evidence" of the inmate's continuing threat to public safety.

17  Lawrence, 44 Cal.4th at 1218-20 & n.20.

18          Thus, "the Board or the Governor may base a denial-of-parole decision
19          upon the circumstances of the offense, or upon other immutable facts such as an inmate's criminal history, **but some evidence will support such reliance** *only* **if those facts support the ultimate conclusion**
20          **that an inmate** *continues* **to pose an unreasonable risk to public safety**.  [Citation.] Accordingly, the relevant inquiry for a reviewing

21

---

22    [15]  "[I]f we are to give meaning to the statute's [Pen. Code § 3041(a)] directive that the Board shall
23  normally set a parole release date [citation], **a reviewing court's inquiry must extend beyond searching the record for some evidence that the commitment offense was particularly egregious and for a mere acknowledgment by the Board or the Governor that evidence favoring suitability exists**.  Instead, under
24  the state and governing regulations, the circumstances of the commitment offense (or any of the other factors related to unsuitability) establish unsuitability if, and only if, those circumstances are probative to the
25  determination that a prisoner remains a danger to the public.  **It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance**
26  **is how those factors interrelate to support a conclusion of current dangerousness to the public**.  [¶] Accordingly, when a court reviews a decision of the Board or the Governor, the relevant inquiry is whether
27  some evidence supports the decision of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings."
28  Lawrence, 44 Cal.4th at 1212 (emphasis added); *see* Shaputis, 44 Cal.4th at 1254.

1
2
3
court is not merely whether an inmate's crime was especially callous or shockingly vicious or lethal, but **whether the identified facts are *probative* to the central issue of *current* dangerousness when considered *in light of the full record before the Board or the Governor*.**"

4   Shaputis, 44 Cal.4th at 1255 (emphasis added) (applying the Lawrence standard, but reaching a

5   different result based on the particular facts of that case).

6   **B.   No Evidentiary Hearing Warranted**

7   Senteno requests an evidentiary hearing "to resolve any significant and relevant factual

8   matters."   AEDPA "now substantially restricts the district court's discretion to grant an evidentiary

9   hearing."   Baja v. Ducharme, 187 F.3d 1075, 1077 (9th Cir. 1999); 28 U.S.C. § 2254(e).[16]   "An

10   evidentiary hearing is not required on allegations that are 'conclusory and wholly devoid of

11   specifics.' "   Campbell v. Wood, 18 F.3d 662, 679 (9th Cir. 1994) (citation omitted).   "Nor is an

12   evidentiary hearing required on issues that can be resolved by reference to the state court record."   Id.

13

14   State courts reviewing parole determinations are limited to the evidentiary record used by the

15   BPH or the Governor to reach the challenged decision.   CAL. PENAL CODE § 3041.2(a).[17]   The

16   Governor's authority is limited to review of the evidentiary record that was before the Board.   Scott,

17   133 Cal.App.4th 573.   Similarly, this Court's role is not to develop the record, but only to determine

18   whether the state court result satisfies the "some evidence" element of the due process inquiry in

19   consideration of the same record.   No additional factual development is warranted or authorized.

20   Senteno's request for an evidentiary hearing is accordingly **DENIED**.

21   //

22
23
24
25
26
---
[16]   "If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court *shall not hold* **an evidentiary hearing on the claim** *unless* **the applicant shows that**— (A) the claim relies on— (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; **or** (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; **and** (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."   28 U.S.C. § 2254(e)(2).

27
28
[17]   "During the 30 days following the granting, denial, revocation, or suspension by a parole authority of the parole of a person sentenced to an indeterminate prison term based upon a conviction of murder, the Governor, when reviewing the authority's decision pursuant to subdivision (b) of Section 8 of Article V of the Constitution, shall review materials provided by the parole authority."   CAL. PENAL CODE § 3041.2(a).

08cv0694

1    **C.    Full Scope Of Requested Relief Is Not Available**

2        The Petition enumerates fourteen discrete requests, including various findings inappropriate

3    to these proceedings, in addition to the evidentiary hearing request rejected above.  (Ancillary Pet.

4    19:5-20:19.)  None of the "abuse of discretion" findings Senteno asks the Court to make would be

5    proper under AEDPA.  *See* 28 U.S.C. § 2254(d).  Senteno also asks the Court to make findings about

6    the "legal requirements" under state law, whereas federal habeas courts may not revisit a state court's

7    construction of its own laws.  Estelle, 502 U.S. at 68; Himes, 336 F.3d at 852; *see* Lewis v. Jeffers,

8    497 U.S. 764, 780 (1990) (no federal habeas relief is available premised on violations of California

9    law).  For example, his Ground One argument the Governor was required to make a "clear error"

10   finding before he could reverse the BPH parole grant presents a purely state law issue. Ground One

11   is on that basis **DENIED**.  Moreover, to the extent Senteno may be asking this Court to apply a "'clear

12   error" standard, federal habeas review is conducted under a standard of "objective unreasonableness"

13   of factual determinations made by state courts or "objective unreasonableness" of a state court's

14   application of controlling United States Supreme Court authority on an issue of constitutional

15   magnitude.  *See* Lockyer, 538 U.S. at 75 (the "clear error" standard and the "objectively unreasonable"

16   standard "are not the same [because] . . . [t]he gloss of error fails to give proper deference to state

17   courts by conflating error (even clear error) with unreasonableness").

18       Senteno also asks the Court to order the Governor "to produce the exact record that was

19   submitted to him in Mr. Senteno's case, and, if it is not complete, to find that the Governor's decision

20   violated due process because the Governor did NOT have before him the complete and same record

21   as was before the Board of Parole Hearings when granting parole." (Ancillary Pet. 20:1-5.)  Although

22   state law requires the Governor to consider the same record as that presented to the BPH, Senteno

23   merely speculates the Governor may have had an incomplete record.  His suspicions are vague and

24   factually unsupported.  He identifies no discrete item of evidence considered by the BPH purportedly

25   not presented for the Governor's consideration on review.[18]  His concern over the completeness of the

26   _____

27   [18]   The BPH stated on the record "all these files are going to go to Sacramento" for the Governor's
consideration, but told Senteno how to separately forward Dr. Schaeffer's 2006 evaluation himself. (Pet. Exh.

28   H, Pt. 3, pp. 51-52.)  Senteno may be concerned the Governor did not have that report, but by all accounts, it
was simply cumulative of the 2000 and 2004 positive psychosocial assessments of record.

1   record presents a separate question from the issue whether the Governor *failed to consider all the*

2   *relevant evidence in the record* he had that is probative of Senteno's parole suitability.[19]

3       Senteno's Ground Two and Ground Three contentions the Governor conducted an

4   "independent suitability hearing without any constitutional safeguards" confuse a "separate suitability

5   hearing" with an independent review of the record.  *See* <u>Rosenkrantz</u>, 29 Cal.4th at 660-61 (the

6   relevant constitutional and statutory provisions contemplate that the Governor will undertake an

7   independent, *de novo* review of the prisoner's parole suitability, but such review is limited to the same

8   considerations as inform the Board's decision). There is no indication the Governor expanded the

9   record with extraneous evidence or lacked any material portion of the record from the BPH.  Both

10  Grounds Two and Three are accordingly **<u>DENIED</u>**, leaving only Ground Four, an alleged due process

11  violation predicated on an absence of evidence to support a determination Senteno presently poses a

12  public safety risk.  Respondent's argument Senteno "received a hearing before the Board, and a copy

13  of both the Board and the Governor's decisions," purportedly in full satisfaction of federal due process

14  (Answer 6:13-14, citing <u>Greenholtz</u>, 442 U.S. at 16) is rejected above.  Respondent's argument

15  "Senteno merely alleges a disagreement with the Governor's decision" in a Petition purportedly devoid

16  of any ground for federal habeas relief (Answer 5:9-14) is rejected below.

17      **D.    <u>The Governor's Determination Senteno Currently Poses A Public Safety Risk Is</u>**
        **<u>Not Supported By "Some Evidence"</u>**

18

19       Having concluded above that California law creates a liberty interest in parole protected by

    due process safeguards, and that those safeguards include the "some evidence" standard articulated
20
    in <u>Hill</u>, the Court must decide whether the state court result upholding the Governor's reversal of the
21
    BPH grant of parole was contrary to or an unreasonable application of that standard, or was predicated
22
    on an unreasonable determination of the facts from the evidence.  28 U.S.C. § 2254(d).
23
         The overarching concern embodied in the parole scheme is public safety, with the proper focus
24
    necessarily on an assessment of the inmate's *current* dangerousness.  <u>Dannenberg</u>, 34 Cal.4th at 1086;
25
    <u>Lawrence</u>, 44 Cal.4th at 1205-06.  "[A]n inmate shall be found unsuitable for parole and denied parole
26

27      [19]   "Under California law, if the Governor exercises his discretion to review the Board's decision
    granting, denying, revoking or suspending an inmate's parole, he must 'review materials provided by the parole
28  authority.' "  <u>McCarns</u>, 534 F.Supp.2d at 1155, *quoting* CAL. PENAL CODE § 3041.2(a).

if, in the judgment of the Board [or Governor] the prisoner will pose an unreasonable risk of danger to society if released from prison." Irons, 505 F.3d at 851 (applying the standard from Hill, 472 U.S. at 457), *quoting* Dannenberg, 34 Cal.4th at 1080. The dispositive question is thus whether the record contains "some evidence" of Senteno's present dangerousness as framed by California's codified criteria. *See* Irons, 505 F.3d at 851; Sass, 461 F.3d at 1128-29; Biggs, 334 F.3d at 915.

Senteno argues a "postcard denial [by the California Supreme Court] upholding the merits of the superior court decision based almost exclusively on Jacobson" was improper, because Jacobson was "in direct conflict with" such cases as Lee, 143 Cal.App.4th1400[20] on the issue of evidentiary standards, and the state court result was "contrary to, and an unreasonable application of, the 'some evidence' standard as set forth by the United States Supreme Court in Superintendent v. Hill, 472 U.S. 445 (1985)." (Ancillary Pet. 2:9-25 (parallel citation omitted).) He argues the Governor's determination was supported by "no evidence whatsoever," rendering the decision arbitrary and a due process violation of his right to receive a parole release date. (Ancillary Pet. 2:19-20.)

> The law requires that a finding of "unreasonable risk" to public safety be made before parole can be denied. **The evidence at the 2006 parole consideration hearing revealed that such evidence no longer existed, or at least it was no longer a reliable predictor of future violence or danger to the public safety if released to parole**. If the Governor reviewed the same record as that before the Board, under a proper and limited standard of review as the law requires, he would not have been able to contradict the Board's findings or conclusions by any evidence to the contrary.[21]

(Ancillary Pet. 4:3-11 (emphasis added).)

A state reviewing court will affirm the Governor's determination so long as his interpretation of the evidence is reasonable and reflects due consideration of all relevant statutory factors, applying the deferential standard of Rosenkrantz, 29 Cal.4th 616. Shaputis, 44 Cal.4th 1241 at 1258. In denying Senteno's habeas petition, the Superior Court engaged in no analysis of any portions of the

---

[20]  Senteno observes the Hayward v. Marshall, 512 F.3d 536 (9th Cir. 2008) case "cited to Lee," although subsequent to the April 4, 2008 filing of his federal habeas petition, Hayward itself became without precedential value pending the result of *en banc* review.

[21]  Senteno characterizes that result as the Governor having "exceeded his authority and abused his discretion." (Ancillary Pet. 4:18-20.)  Any such error provides no basis for federal habeas relief. Senteno's suspicion the Governor reviewed an incomplete record is pure speculation.

record other than those associated with the two unsuitability factors the Governor singled out to

support his conclusion:  the circumstances of the commitment offense and Senteno's prior criminal

history.  Once it found the Governor had characterized those factors as a vicious crime committed by

someone with a deplorable criminal record, the court deemed itself "estopped" from disturbing the

Governor's determination to reverse the BPH parole grant.  (Answer Exh. 2.)  The court explained:

> "Resolution of any conflict in the evidence and the weight to be given the evidence are matters within the authority of the Governor.  As with the discretion exercised by the Board in making its decision, **the precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the Governor,** *but the decision must reflect an individualized consideration of the specified criteria* **and cannot be arbitrary or capricious**.  It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole.  **As long as the Governor's decision reflects due consideration of the specified factors as applied to the individual prisoner** in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the Governor's decision."

(Answer Exh. 2, Dkt No. 9-9, p. 4 (emphasis added), quoting Jacobson, 65 Cal.Rptr.3d 222, 2007 WL

2420675 at *6.)

Although that summary accurately reflects the standards, "individualized consideration of the

specified criteria" must include the evidence associated with the codified suitability factors.  The entire

record must contain "some evidence" collectively adequate to support the ultimate finding of present

public danger warranting denial of parole.  "Some evidence" of certain discrete unsuitability factors,

standing alone, is insufficient.  CAL. CODE REGS. §§ 2401, *et seq.*; *see* In re Smith, 114 Cal.App.4th

343 (2003) (directing the Governor to vacate his decision reversing a BPH grant of parole and to

reinstate the BPH decision for lack of "some evidence" to support the Governor's opinion the

prisoner's offense was a sufficiently "callous crime" to satisfy the special gravity, cruelty, or

viciousness required for that unsuitability factor to remain predictive of current dangerousness in light

of the full record); *see also* Lawrence, 44 Cal.4th at 1214 (the nature of the crime does not in and of

itself constitute some evidence of current dangerousness to the public; the record must also establish

that something in the prisoner's pre-incarceration or post-incarceration history or current demeanor

1   and mental state indicates that the dangerousness implications derived from the commission of the

2   commitment offense remain probative to the statutory determination of a continuing threat to public

3   safety); <u>Scott</u>, 133 Cal.App.4th at 596 (Governor's reliance on the gravity of the offense, without

4   considering large body of evidence that inmate committed the murder while suffering significant

5   stress, was arbitrary and capricious).

6          A prisoner's exemplary behavior in prison and efforts to work on correctable influences

7   contributing to the commitment offense, plus favorable psychological reports, undermine the

8   predictive value of a remote offense circumstances. *See, e.g.*, <u>Thomas v. Brown</u>, 513 F.Supp.2d 1124,

9   1130-35 (N.D.Cal.2006) (holding the Governor's decision to reverse a BPH panel's parole grant was

10  not supported by "some evidence" because the manner of the 20-year-old commitment offense was

11  not predictive of present unsuitability).  Similarly, the Governor's opinion a petitioner has not fully

12  accepted responsibility for the crime lacks evidentiary support when it contradicts forensic

13  assessments. <u>Id.</u> at 1132-33.  The Governor's opinion a petitioner needs more programming to address

14  anger or other causative issues, when inconsistent with professional assessments of rehabilitation and

15  ratings of low risk for violence the Governor ignores or rejects for reasons not explained or reconciled,

16  can only be construed as similarly arbitrary.  <u>Id.</u> at 1133-34.  For example, in this case, the Governor

17  highlighted the sentencing judge's 1983 comment to Senteno in imposing a consecutive sentence for

18  the 1981 murder tacked to the term he was already serving for three armed robberies:  "you have

19  demonstrated an inability or unwillingness to rehabilitate yourself."  (Answer, Dkt No. 9-8, p. 20.)

20  More than twenty years had passed since that observation with overwhelming evidence of Senteno's

21  rehabilitation amassed in the intervening years.

22         In his September 28, 2006 statement of decision, the Governor summarized the factual

23  circumstances of Senteno's murder offense, including the description of Senteno's involvement in the

24  beating death of Michael Bottoms as recited by the Court of Appeal:

25                  . . . Mr. Bottoms had been placed in a holding cell in the courthouse
                   basement with several other prisoners, including Mr. Senteno and
26                 Arthur Ruffo.  Mr. Senteno and Mr. Ruggo confronted Mr. Bottoms,
                   and Mr. Ruffo struck him in the face.  Mr. Bottoms fell, and both
27                 partners hit him.  Mr. Ruffo stomped on Mr. Bottoms while Mr.
                   Senteno knelt and punched him about his throat.  Mr. Senteno stood
28

1   and kicked Mr. Bottoms in the throat, chest and stomach. **After the**
**assault ended, the partners retreated and Mr. Bottoms rose and**
2   **moved toward a wall. Another prisoner then struck, kicked and**
**stomped Mr. Bottoms**. When the prisoners were summoned out of the
3   holding cell, Mr. Bottoms did not respond. He was found to be
comatose and later died of brain injuries.
4
(Answer, Dkt No. 9-8, p. 20 (emphasis added).)
5
The Governor stated: "Given the record before me, . . . particularly the Court of Appeal's
6
finding that Mr. Senteno '<u>directly</u> engaged in a vicious assault on Bottoms and admitted as much to
7
other inmates' (original emphasis), I do not adopt his version of events." (Answer Dkt No. 9-8, p. 22.)
8
Despite the positive factors that I have considered, **the second-degree**
9   **murder for which Mr. Senteno was convicted was especially**
**atrocious because he knowingly and actively participated in the**
10   **unprovoked beating death of another person in his holding cell**,
who was outnumbered by his attackers. According to the Court of
11   Appeal opinion, Mr. Senteno punched and kicked Mr. Bottoms in the
throat, chest and stomach while his partner hit and stomped on him.
12   Indeed, this offense was carried out in a manner demonstrating an
exceptionally callous disregard for Mr. Bottoms' suffering and life.
13   The sentencing judge noted that "[t]he offense committed was
committed within the confines of the penal system. It was a brutal,
14   cold-blooded, hard-hearted – it is hard, I think, if you sat where I sat
and saw somebody beating a helpless guy, he is insensible and you are
15   still beating him, you would say 'how could a guy do that to another
guy.' " Mr. Senteno had several opportunities to cease during this
16   crime. He could have stopped after hitting Mr. Bottoms, after punching
him, and after kicking him, yet he chose to continue. The **gravity of**
17   **the second-degree murder** committed by Mr. Senteno **is alone**
**sufficient for me to conclude presently that his release from prison**
18   **would pose an unreasonable public-safety risk.** His record of **other**
**violent and criminal acts** also weighs against parole, and the fact that
19   Mr. Senteno **committed the life offense while in jail for several**
**armed robberies makes his actions even more reprehensible**.
20
(Answer, Dkt No. 9-8, p. 22 (emphasis added).)
21
The Superior Court found the Governor's characterization of the commitment offense provided
22
the "modicum of evidence" required to sustain the decision because he had also traced Senteno's
23
several other convictions and characterized that history as "deplorable and violent."[22] (Answer Exh.
24

25   ----
[22]   The Governor's statement contains two paragraphs summarizing Senteno's criminal history. "Mr.
26   Senteno was 32 years old when he perpetrated the life offense, and although he had no juvenile record, he
already had an adult criminal record," comprised of: a conviction "at age 18 for possessing marijuana for sale;"
27   "at age 24 he was charged with 17 counts of first-degree robbery while armed with a deadly weapon," for which
he was sentenced by plea agreement to 10 years to life in prison after his guilty plea to two counts of first-
28   degree robbery; he was "paroled after serving less than four years of his sentence, and, while still on parole,
he was convicted of robbery and was sentenced to three years in prison;" after his release from prison, he was

08cv0694

2, pp. 3-4.)  However, the Governor's scepticism does not constitute *evidence* the petitioner *remains dangerous*.  Even "direct" engagement in a "vicious assault" does not necessarily support the characterization of the crime as "especially heinous and atrocious" within the meaning of the parole regulations, nor does remote conduct necessarily remain probative of the prisoner's public safety threat twenty-five years later.  *See* In re Vasquez, 170 Cal.App.4th 370, 383-84 (2009) (vacating the Governor's decision to reverse the Board's order granting parole, observing "[a]ny murder is atrocious and hitting and kicking an unconscious opponent shows a callous disregard for human suffering, but the regulation requires some evidence of exceptional callousness," finding "the evidence cited by the Governor [*i.e.*, continuing to hit and kick the victim after he stopped fighting] does not show *exceptional* callousness and was insufficient to show that this particular crime was *especially* heinous, atrocious or cruel"); *see also* Smith, 114 Cal.App.4th at 366 ("[*A*]ll second degree murders by definition involve some callousness – i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feelings and suffering of others").  "Because parole is the rule, rather than the exception, . . . the inquiry must be whether the particular crime was '**exceptionally** callous,' so as to be described as '**especially** heinous, atrocious, or cruel.' "[23]   Vasquez, 170 Cal.App.4th at 383

---

arrested at age 32 for several armed robberies – the robberies for which he was in jail when he committed the life offense;" "[a]t age 35 – after Mr. Senteno committed the life offense, but before entering state prison – he was convicted of assault with a deadly weapon [for participating with others in a jailhouse attack on deputies] and was sentenced to four years in prison," to be served concurrently with the life sentence; and "Mr. Senteno was arrested or detained on six occasions for transporting or possessing narcotics, none of which led to a conviction."  (Answer, Dkt No. 9-8, pp. 20-21.)  "Before he was transferred to state prison to serve his life sentence, Mr. Senteno committed 10 rule violations in county jail." (Id. p. 21.)  He was disciplined two times for rules violations while in prison, most recently in 1984 for possession of an inmate-manufactured weapon "upon his re-entry into prison," at which time he "admitted 'close association' with the Mexican Mafia and Aryan Brotherhood prison gangs."  (Id.)  The Governor also noted Senteno had admitted at his BPH suitability hearing "he had used heroin for 15 years, until 1985."  (Id.)

[23]  For the commitment offense factor to justify denial of parole, the crime must have been "committed . . . in an especially heinous, atrocious or cruel manner."  CAL CODE REGS., tit. 15, § 2402(c)(1).  Evidence of "especially" heinous conduct includes:  multiple victims; dispassionate manner such as execution-style murder; abusing, defiling, or mutilating the victim; exceptionally callous disregard for suffering; and motive inexplicable or trivial in relation to the offense. Id., 2402(c)(1)(a)-(e); *see* Rosenkrantz, 29 Cal.4th at 653-54, n. 11.  The Rosenkrantz court found the defendant had "brutally murdered" his victim in a crime involving a week of planning and rehearsal before the defendant killed the victim by firing ten shots at close range and three or four shots into the victim's head as he lay on the pavement, circumstances supporting the Governor's finding the manner of the offense satisfied the regulatory requirement the crime was especially heinous, atrocious, cruel style, in addition to other unsuitability factors supported by the evidence, collectively constituting a sufficient basis for parole denial.  Id. at 678.  Other examples of circumstances found to be especially heinous or atrocious, for comparison purposes, are selected in Lee, 143 Cal.App. 4th at 1410-11, *inter alia*:  Dannenberg,

1    (emphasis added), *quoting* CAL. CODE REGS., tit. 15, § 2402(c)(1).

2          The Court finds the Governor's characterization of Senteno's participation in the murder as

3    particularly egregious is not supported by the evidence, is objectively unreasonable, and therefore

4    insufficient to support a denial of parole in consideration of the entire record.  All versions of the 1981

5    crime description substantiate the holding cell attack involved several inmates confined in close

6    proximity.  Senteno was affiliated with a prison gang and abused drugs, factors he had eliminated from

7    his life nearly two decades before his fifth suitability hearing.  He was removed from the cell before

8    others resumed beating the victim in the attack from which he did not recover.[24]  No evidence supports

9    the characterization of the crime as exceptionally callous or especially heinous, or that decades later,

10   even if it had been, it remains predictive of current dangerousness.  The Governor identified no

11   evidentiary nexus between the circumstances of the crime and his conclusory determination Senteno

12   currently poses an "unreasonable risk of danger to society if released from prison" (CAL. CODE REGS.,

13   tit. 15, § 2402(a)), as would be required to satisfy due process.  Irons, 505 F.3d at 851.

14         No other unsuitability factors findings, in isolation or collectively, are supported by the "some

15   evidence" required for the Governor's reversal of the BPH grant of parole to satisfy due process,  let

16   alone "some evidence" bearing "indicia of reliability."  Biggs, 334 F.3d at 915.  Although the

17   Governor questioned the genuineness of Senteno's remorse and acceptance of responsibility for the

18

19   34 Cal.4th at 1095 (the defendant "reacted with extreme and sustained violence," striking "multiple blows to his wife's head with a pipe wrench," then, while she was helpless from her injuries, he placed her head "into

20   a bathtub full of water" to complete the killing, "or at least left it there without assisting her until she was dead;" In re McClendon, 113 Cal.App.4th 315, 321-22 (2003) (the defendant planned a "calculated attack" in the "middle of the night" against his estranged wife, arriving at her home wearing rubber gloves and carrying a

21   handgun and a wrench which he used to attack her and another victim); In re Van Houten, 116 Cal.App.4th 339, 356, 351, 366 (2004) (the defendant participated in the "premeditated," "gratuitous mutilation" of a married

22   couple during which the wife "was stabbed a total of 42 time" and "struggled for her life while hearing her husband meet his gruesome fate").

23

24   [24]   The April 1, 1983 Probation Report considered in connection with Senteno's sentencing substantiated witnesses suggested his involvement may have been precipitated by membership in the Aryan

25   Brotherhood Prison Gang, and it also appeared "that the killing was motivated by the anger of Arthur Ruffo who had apparently previously suffered some commissary loss at the victim's hands." (Pet. Exh. C, p. 9.)  The

26   Statement By Judge And District Attorney pursuant to CAL. PENAL CODE § 1203.1(CDC-173 Statement) noted: "Senteno was primarily an aider and abettor in this case.  He and Ruffo initially attacked the victim, and while Ruffo pummeled the victim, Senteno landed several punches and perhaps a couple of kicks.  After the initial

27   attack, Senteno did not physically participate any further.  His motive was he is EME, that Robert Crane (AB) had told Ruffo to 'make his bones' for AB entry by killing Bottoms.  Because of Senteno's prison gang status,

28   he felt obligated to support and back up Ruffo."  (Pet. Exh. D, Dkt No. 2-4.)

victim's death, he did not actually posit those reservations as factual findings.  His speculative scepticism stands in sharp contrast to the considerable evidence of Senteno's acceptance of responsibility and his remorse, in particular the evaluations by mental health professionals from 2000 and 2004, as they were reviewed on the record by the BPH.  The Governor also noted "the Orange County District Attorney's office appeared at Senteno's 2006 parole hearing and opposed his parole based on the gravity of the offense and his failure to accept responsibility for it, as well as his violent criminal history."  (Answer Dkt No. 9-8, p. 22.)  The District Attorney's views are not evidence.  Deferral to the government's representative may not substitute for due consideration of the entire record.  *See* McCarns, 534 F.Supp.2d at 1153-55, *citing* Rosenkrantz v. Marshall, 444 F.Supp.2d 1063, 1080 n.14 (C.D.Cal. 2006) (granting federal habeas relief for lack of "some evidence" the circumstances of the crime continued to support a dangerousness finding, so that parole denial violated due process as an unreasonable determination of the facts and as an unreasonable application of the clearly established Supreme Court precedent in Hill, 472 U.S. at 455), *citing, inter alia*, McQuillion, 306 F.3d at 912.

A single paragraph of the Governor's three-page decision purports to address "various positive factors" from the evidence.  (Answer Dkt No. 9-8, pp. 20-21.)

> I have considered various positive factors in reviewing whether Mr. Senteno is suitable for parole at this time.  In addition to **remaining discipline free for more than 16 years** and **ceasing his association with prison gangs for many years**, Mr. Senteno **made efforts in prison to enhance his ability to function within the law upon release**.  A high school graduate when he entered Prison, Mr. Senteno took several college and emergency management courses.  He completed a paralegal program and he had vocational training in auto mechanics. He worked such institutional jobs as teacher's assistant and tier tender, and worked in Arts in Corrections and in culinary, among other things.  **He availed himself of an array of self-help and therapy**, including Alcoholics Anonymous, Narcotics Anonymous, Substance Abuse Relapse Prevention Program, Peer Education Program, Criminals and Gang Members Anonymous, Breaking Barriers, Anger Management and Parenting Program, and he attended several self-help seminars.  His **extra-curricular activities** include Laubach Literacy Tutor, acting as a "Big Brother" to mentally ill inmates and facilitating the Juvenile Diversion Program.  **He maintains supportive relationships with family and friends** and **he received some positive evaluations from mental health and correctional professionals over the years**.  His **plans upon parole** include living with his friend in Los Angeles County, the county to which the Board

approved his parole, and working as a case manager for a non-profit organization.

(Answer Dkt No. 9-8, p. 21.)

That paragraph consists of an unelaborated inventory of Senteno's multiple accomplishments while incarcerated, suitability factors the Governor was required by statute to *actually evaluate*.  Both the Governor and the BPH must give *due* consideration to "all relevant, reliable information available," positive and negative, bearing on parole suitability.  CAL. CODE REGS., tit. 15, § 2402(b). He did not attempt to reconcile the considerable positive evidence of Senteno's evolution with his unsuitability conclusion.  His decision is devoid of any discussion justifying his dismissive allusion to "positive evaluations from mental health . . . professionals and correctional professionals over the years," in particular the psychosocial assessments from 2000 and 2004 directly addressing the dispositive issue of Senteno's current safety risk level.  (Pet. Dkt No. 2-4, Exh. G, pp. 101-106.)  He merely offers the cursory summary  the "various positive factors" did not "outweigh" the negative factors of the 1981 offense circumstances and prior criminal history, ending in about 1985. (Answer Dkt No. 9-8, p. 21.)

The Superior Court concluded "a modicum of evidence supports the reversal decision" based on the Governor's finding the offense was heinous and his characterization of Senteno's criminal history "deplorable and violent."  (Answer Exh. 2, Dkt No. 9-9, p. 4.)

> Here, the Governor stated that he could conclude **based on the crime alone** that Petitioner's release would pose an unreasonable public-safety risk.  The Governor did not, however, base his reversal on the crime alone.  Rather, the Governor discussed Petitioner's **criminal history**, calling it "deplorable and violent" and noted his several convictions were based on crimes committed both "inside correctional institutions as well as in free society."  This history, according to the Governor, "weighs against parole."

(Answer Exh. 2, Dkt No. 9-9, p. 4.)

However, it appears to this Court the Superior Court understated the Governor's virtually exclusive reliance on the circumstances of the crime to reverse the BPH.  The Governor actually stated: "**The gravity of the second-degree murder committed by [Petitioner 25-years earlier]** *is alone sufficient for me to conclude* **presently that his release from prison would pose an**

- 32 -

1   **unreasonable public-safety risk."** (Answer Dkt No. 9-8, p. 22 (emphasis added).)  He traced

2   Senteno's "other violent and criminal acts" from two decades ago, but merely declared them as "also

3   weigh[ing] against parole."  (Answer, Dkt No. 9-8, p. 22.)  Every psychological evaluation back to

4   the late 1990's concluded Senteno would pose little or no danger to public safety if released on parole.

5   The Governor listed the evidence of suitability factors that convinced the BPH of Senteno's parole

6   readiness in a single paragraph, but mechanically dismissed it all without individualized consideration.

7   His failure to reconcile the considerable rehabilitation evidence in the intervening years with the

8   circumstances and impetus for the commitment crime resulted in an objectively unreasonable

9   determination of the facts.  Miller-El, 537 U.S. at 340.

10      The Governor's ritualistic incantation of the "unreasonable risk of danger to society" phrase

11  is factually unsupported by the record.  The Superior Court's finding of "a modicum of evidence" in

12  the record to support the unsuitability *factors* of an atrocious crime and deplorable criminal history

13  likewise does not support the conclusion the Senteno would currently pose an unreasonable risk of

14  public danger if released necessary.  The Court therefore also finds the state court result upholding the

15  Governor's reversal of the BPH's 2006 grant of parole was contrary to the clearly established authority

16  of Hill, 472 U.S. 445 as applied to the state law mandate creating a liberty interest in parole.  28

17  U.S.C. § 2254(d).  Accordingly, the Court **GRANTS** Senteno habeas relief under the Petition Ground

18  Four due process challenge.

19      **E.   Remedy**

20      "[T]he next question concerns the proper remedy."  Thomas, 513 F.Supp.2d 1124, 1136-37.

21  The Thomas BPH panel had found the petitioner suitable for parole and had performed calculations

22  to assess a total term of confinement less post-conviction credits, to arrive at a total period of

23  confinement expressed in a specified number of months.  Thomas, 513 F.Supp.2d at 1136-37.  The

24  Governor reversed the BPH, and was upheld by the state courts, but on federal habeas review, the

25  court found "the Governor's decision was not supported by some evidence" and granted relief.  Id.

26  In granting relief, the Thomas court observed the BPH had already calculated the petitioner's release

27  date  in connection with its grant of a parole, and that date had already passed.  "[T]his court need not

28

send the matter back to the BPH to set a term for [Petitioner] because the BPH has already done so." Id.; *see also* Vasquez, 170 Cal.App.4th 370 (in vacating the Governor's decision to reverse a grant of parole for lack of "some evidence" the prisoner posed an unreasonable risk to public safety, the Court of Appeal would not remand the matter to the Governor for further consideration).  Like the reviewing court in Vasquez, on this record, the Court concludes:

> The Governor's constitutional authority is limited to a review of the evidence presented to the Board [under the same standards "on the basis of the same factors which the parole authority is required to consider"].  Cal. Const., art. V, § 8, subd. (b); see also Pen. Code § 3041.2, subd. (a).  **Our review indicates that the record does not contain some evidence to support the Governor's decision and further consideration by the Governor will not change this fact**.

Vasquez, 170 Cal.App.4th at 386 (emphasis added); *see also* McCarns, 534 F.Supp.2d at 1154-55 ("the Governor's reversal of the Board's grant of parole . . . is not supported by 'some evidence' in the record, and the Superior Court's conclusion to the contrary was an unreasonable application of clearly established federal law,"[25] entitling petitioner "to the release date ordered by the Board").

As in Thomas, at Senteno's May 2, 2006 suitability hearing, the BPH calculated his parole release date, including consideration of his earned good-time credits and suggested it had already passed..[26]  (Pet. Exh. H, Pt. 3, pp. 45-47.)  As in Vasquez, remand for a new review of the same evidence by the Governor would be futile because the Court has concluded the BPH decision should be reinstated, including its parole release calculations.

//

//

//

//

//

---

[25] Citing, in addition to Hayward, which was not yet on *en banc* review at the time: Rosenkrantz, 444 F.Supp.2d at 1087; Martin v. Marshall, 431 F.Supp.2d 1038, 1049 (N.D.Cal.2006), *amended by* 448 F.Supp.2d 1143 (N.D.Cal.2006); Scott, 133 Cal.App.4th at 603; Thomas, 513 F.Supp.2d at 1136-37.

[26] Although the panel did not specify a release date, its calculation "from the period of time from May 4, 1983 to today, May 2, 2006" totaled "258 months."  (Pet. Exh. H, Pt. 3, p. 46.)  "And you can do the math," suggesting release would be immediate, assuming no contrary action by the Governor.  (Id., p. 46, 50.)

1   **III.    CONCLUSION AND ORDER**

2           For all the reasons set forth above, the Court finds the Governor's September 2006 reversal of

3   the BPH grant of parole to Senteno in May 2006 was not supported by "some evidence" on the

4   dispositive public safety issue, in violation of his federal due process rights.  The Orange County

5   Superior Court's conclusion to the contrary deprived him of his  protected liberty interest in obtaining

6   a release date without the constitutionally-required procedural safeguards, as he contends in his

7   Petition Ground Four.   The Petition is therefore **GRANTED** on that basis.  **IT IS HEREBY**

8   **ORDERED** Judgment shall be entered in Senteno's favor.  **IT IS FURTHER ORDERED** the BPH

9   decision granting him parole shall be reinstated and implemented within 30 days of the date this Order

10  is entered according to the calculations provided in the BPH decision, as adjusted to encompass any

11  intervening considerations, such as credit for custodial time served since the release date he would

12  have received on the May 2006 finding of suitability, or the date when that finding would have

13  become final pursuant to CAL. PENAL CODE § 3041(b) and 3041.2(a), whichever is later.

14          **IT IS SO ORDERED**.

15

16  DATED:  December 7, 2009

17                                                            _Janis L. Sammartino_
                                                            Honorable Janis L. Sammartino
18                                                          United States District Judge

19

20

21

22

23

24

25

26

27

28

08cv0694